# UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**ROBERT J. SPENLINHAUER,**                     Chapter 7
   Debtor                                       Case No. 13-17191-JNF
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**LYNNE F. RILEY, CHAPTER 11 TRUSTEE[1]**
   Plaintiff
v.                                              Adv. P. No. 16-1064
**ERIK D. JOSEPHSON, INDIVIDUALLY
AND AS TRUSTEE AND BENEFICIARY
OF WINDING WAY REALTY TRUST**
   Defendant
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
**LYNNE F. RILEY, CHAPTER 11 TRUSTEE**
   Plaintiff
v.                                              Adv. P. No. 16-1138
**JACKSON HOLE CLASSIC CARS, LLC**              (consolidated with
**AND ERIK D. JOSEPHSON**                       Adv. P. No. 16-1064)
   Defendants

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I. INTRODUCTION

The following matters are before the Court for determination:  1) the Trustee's

Motion for Contempt Order and Related Sanctions against Robert Spenlinhauer (the

---

[1] The above captioned adversary proceedings were commenced by Lynne F. Riley when she was the Chapter 11 Trustee of the Debtor.  She has not sought to amend the complaints in either proceeding since she became the Chapter 7 Trustee of the Debtor on June 25, 2018.

"Debtor"),  Erik Josephson ("Josephson") and Jackson Hole Classic Cars, LLC ("JHCC"

or "Jackson Hole") for Defying Court Order (#1477) filed by Lynne F. Riley (the

"Trustee") in the Debtor's case on June 5, 2018;[2] and 2) the Trustee's Motion for Contempt

Order and Related Sanctions against Josephson Individually and as Trustee and

Beneficiary of Winding Way Realty Trust For Violating Preliminary Injunction Order

(#103) filed by the Trustee on June 20, 2018 in Adv. P. No. 16-1064,[3] which is consolidated

---

[2] In her Contempt Motion against the Debtor, Josephson and Jackson Hole, the then
Chapter 11 Trustee set forth possible sanctions as follows:

> i. conversion of this case to Chapter 7 for cause, as argued in the Trustee's
> Motion to Convert filed contemporaneously herewith;
> ii. an order authorizing the Trustee to obtain the assistance of the  U.S.
> Marshall, or other appropriate repossession professionals, to enter
> property of third parties as necessary to recover the Vehicles;
> iii. imposition of monetary sanctions for the costs borne by the estate for
> the Trustee's efforts, in court and out, pursuing compliance with the
> Turnover Order;
> iv. a monetary sanction as penalty for willfully moving Vehicles to a
> location expressly prohibited by the Court's order; and
> v. an order authorizing the Trustee to liquidate one or more Estate
> Vehicles, in her discretion, as necessary to pay any monetary sanction
> award.

[3] In her Contempt Motion against Josephson, individually and as trustee and beneficiary
of the Winding Way Realty Trust, the then Chapter 11 Trustee set forth requests for
sanctions as follows:

> i. an order that the proceeds in the Fidelity account be transferred
> immediately to a third party escrow agent;
> ii. an order that Josephson restore the full amount withdrawn from the
> Fidelity account, $63,764.11, plus lost investment gains on the
> withdrawn amounts;
> iii. imposition of monetary sanctions for the costs borne by the estate for
> the Trustee's efforts, in court and out, pursuing compliance with the
> Injunction;
> iv. imposition of a monetary sanction as penalty for willfully violating the

with Adv. P. No. 16-1138 (jointly, the "Contempt Motions").  The Trustee commenced

both adversary proceedings and filed both Contempt Motions when she was the Chapter

11 Trustee of the Debtor.  On June 25, 2018, the Court converted the Debtor's case to one

under Chapter 7, finding that the Debtor had failed to comply with the Court's order of

January 24, 2018 and had failed to cooperate with the Chapter 11 Trustee. Following the

conversion to Chapter 7, Lynne F. Riley was appointed as the Chapter 7 Trustee.  The

Debtor responded to the Contempt Motion in the main case, however, Josephson did not.

In view of the extensive record of this case, the Court incorporates facts it has

previously found regarding the entry of the preliminary injunctions referenced below, its

order dated January 24, 2018 in the main case, as well as the record of proceedings in the

main case and the now consolidated adversary proceedings.  At the outset, the Court

notes that the conduct of the Debtor and Josephson during the case and related adversary

proceedings has created numerous questions and issues about their compliance with

Court orders.

The following matters are germane to resolution of the Contempt Motions:  1) the

orders dated June 28, 2016[4] (#57) and July 14, 2016 (#70), entered in Adv. P. No. 16-1064,

---

Injunction; and
v. entry of a default judgment in favor of the Trustee on all counts of her
pending complaint in this adversary proceeding.

[4] The Court entered the following order on June 28, 2016 (#57):

Upon consideration of: 1) the Plaintiff's First Amended Complaint (the
"complaint"), through which she seeks avoidance of the Transfer, as
defined in the complaint, for the benefit of the estate (#14); 2) the Plaintiff's
Ex Parte Motion for Temporary Restraining Order and Preliminary

enjoining Josephson, individually and as trustee and beneficiary of the Winding Way

Realty Trust, as well as his agents, employees, assignees, pledgees, nominees, successors,

and other representatives, from "transferring, encumbering, mortgaging, pledging,

secreting, alienating, assigning, or otherwise disposing of the proceeds of Josephson's

sale of the property at 84 Winding Way, Plymouth, MA, in [an] amount not less than

$375,119.64 ("Proceeds"), or from taking or permitting the taking of any action which

would result in a dissipation or dilution of the value of the Proceeds;" 2) the order dated

---

Injunction (#25); 3) the undisputed fact that the Defendant received the
Property, as defined in the Complaint, from the Debtor and which is alleged
to be both an actual and fraudulent transfer under 11 U.S.C. Sec. 548; 4) the
Opposition of the Defendant (#36); 5) the Affidavit of the Debtor, Robert J.
Spenlinhauer (#37); 6) the arguments of the parties at the hearing held on
June 15, 2016; 7) the Supplemental Memoranda filed by the Plaintiff and
Defendant on the legal issue regarding the statute of limitations under 11
U.S.C. Section 546; and 8) the standards for issuance of a preliminary
injunction under Fed. R. Bankr. P. 7065, the Court finds and rules as follows.
The Motion is allowed. The Plaintiff has a likelihood of success on the
merits of her complaint. The statute of limitations does not bar the Plaintiff's
action. *See* In re Raynor, 617 F. 3d 1065 (8th Cir. 2010); In re Art & Co., Inc.,
179 B.R. 757 (Bankr. D. Mass. 1995). Moreover, the Plaintiff has shown that
a number of the badges of fraud are present regarding the transfer of the
Property by the Debtor to the Defendant, including inadequate
consideration, an insider relationship, and financial problems of the
transferor. Furthermore, the Plaintiff has shown that the estate is likely to
suffer irreparable harm if the injunction is not granted and such harm will
outweigh the harm to the Defendant as a result of the requested injunction,
as absent an injunction, the Defendant will be free to dispose of the funds
which were the proceeds of the sale of the Property which is the subject of
the Trustee's complaint to avoid a fraudulent transfer. Finally, the Court
notes that the Defendant sold the real estate after the filing of the Plaintiff's
original complaint, after a hearing on the Plaintiff's Motion for Lis Pendens,
during the period in which the Court had under advisement the Motion for
Lis Pendens and during that period Defendant's counsel filed a brief on
May 16, 2016 in which he did not disclose the sale by the Defendant. . . .

August 9, 2016 (#10), entered in Adv. P. No. 16-1138, enjoining Josephson and Jackson

Hole, as well as their "agents, employees, assignees, pledgees, nominees, successors and

other representatives, . . . from transferring, encumbering, mortgaging, pledging,

secreting, alienating, assigning or otherwise disposing of the vehicles as defined in the

Plaintiff's Complaint;"[5] 3) the order dated June 25, 2018 (#1510), entered in the main case,

in which the Court (a) determined, based upon the undisputed facts and record of

proceedings in the Debtor's Chapter 11 case, that the Debtor, Josephson, and JHCC had

failed to comply with an order of the Court entered on January 24, 2018 pursuant to which

the Court granted the Chapter 11 Trustee's Motion to Secure and Store Vehicles to

Preserve Estate Property in the Face of Eviction (#1293),[6] and (b) entered an interim order

as follows:

> By 5:00 PM on June 26, 2018, the Debtor, Josephson, and Jackson Hole shall
> provide to the newly appointed Chapter 7 trustee a list of all of the Vehicles
> together with a specific address as to their current location. By 5:00 PM on
> June 27, 2018, the Debtor, Jackson Hole, and Josephson are ordered to
> deliver to the Chapter 7 trustee or her agents all keys, registrations, titles,
> and other documents relating to ownership of all of the Vehicles. The
> Chapter 7 trustee is authorized to take all necessary action to safeguard and
> obtain possession of the Vehicles. The Court shall hold an evidentiary
> hearing on July 10, 2018 at 1:00 PM on the motion, in particular, as to

---

[5] The following vehicles were referenced in the Complaint against Josephson and Jackson
Hole in Adv. P. No. 16-1138: (1) 1969 Chevrolet, VIN 136379K368719; (2) 1981 GMC
pickup truck, VIN 2GTDC14H9B1500888; (3) 1967 Chevrolet, VIN 194677S102158; (4)
1968 Pontiac, VIN 237678P168429; (5) 1965 Chevrolet, VIN 136805Z118119; and (6) 1969
Chevrolet, VIN 124379N568539.  The adversary proceedings were consolidated on
November 30, 2016.

[6] The Court observes that at no time during the hearing held on January 24, 2018 did
counsel to the Debtor or counsel to Josephson represent that most of the vehicles owned
by the Debtor and Jackson Hole had already been transported to Parsonsfield, Maine.

whether the Debtor, Jackson Hole, and/or Josephson should be held in contempt and whether sanctions should be imposed on them. [#1510];

4) the testimony and exhibits submitted at the evidentiary hearing held on July 10, 2018 to determine whether the Debtor, Jackson Hole, and/or Josephson should be held in contempt and whether sanctions should be imposed on them; and 5) the Status Report (#123) filed by the Chapter 7 Trustee on July 12, 2018, in Adv. P. No. 16-1064, in which she reported the following:

> Following entry of the Contempt Order, the Trustee served a certified copy of the Contempt Order on Fidelity Brokerage Services, LLC ("Fidelity"). On July 12, 2018, the Trustee received a check from Fidelity in the amount of $365,315.64. This sum was represented to be all of the funds held by Fidelity in the name of Winding Way Realty Trust as of the date it received notice of the Contempt Order.

## II. FINDINGS OF FACT

A. <u>The Motion for Contempt and Sanctions against Josephson, Individually and as Trustee and Beneficiary of Winding Way Realty Trust-Adv. P. No. 16-1064</u>

The Trustee commenced Adv. P. No. 16-1064 on April 19, 2016, alleging that the Debtor fraudulently transferred his interest in the real property located at 84 Winding Way, Plymouth, Massachusetts (the "Winding Way property") to Josephson, as trustee of the Winding Way Realty Trust, on January 17, 2013 and sought to recover the property. On the date she commenced the adversary proceeding, the Trustee also filed a Motion for Approval of Memorandum of Lis Pendens with respect to the Winding Way property, which the Court scheduled for hearing on May 4, 2016.  Approximately one month after the commencement of Adv. P. No. 16-1064, and before the hearing on the Motion for Lis Pendens, Josephson established a Fidelity Investments account in the name of Winding

Way Realty Trust and deposited the sum of $375,560.40 into that account on May 16, 2016.

That sum represented the net proceeds of the sale of the Winding Way property which

had occurred, without the Trustee's knowledge, on May 2, 2016.[7]

The Trustee, upon learning of the sale of the Winding Way property, filed an *Ex

Parte* Motion for Temporary Restraining Order and Preliminary Injunction on May 27,

2016, seeking to restrain Josephson and his agents from transferring or dissipating the

sale proceeds.  The Court entered the requested Temporary Restraining Order on May

31, 2016 and scheduled a hearing on the Motion for June 15, 2016, with notice to

Josephson.  At that time, Josephson was represented by counsel who filed an Opposition

to the motion and who attended the June 15, 2016 hearing.  At the June 15, 2016 hearing,

in view of legal arguments made by Josephson's counsel, the Court ordered the parties

to file supplemental briefs and extended the Temporary Restraining Order. Thereafter,

following the filing of the parties' briefs, the Court issued an order on June 28, 2016,

reproduced at footnote 4, which allowed the Trustee's Motion for a preliminary

injunction and enjoined Josephson and his agents from transferring the proceeds of his

sale of the Winding Way property.  Josephson's attorney received electronic notice of the

June 15 and 28, 2016 orders.  Following the issuance of the June 28, 2016 order, Josephson

filed an Affidavit on July 6, 2016 (#61) in which he represented that "All of the net

proceeds from the [sale] transaction were deposited into a Fidelity brokerage account

---

[7] The Court may take judicial notice of its own docket. *See* LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.), 196 F.3d 1, 8 (1st Cir. 1999) ("The bankruptcy court appropriately took judicial notice of its own docket.").

held in my name, as Trustee of the Winding Way Realty Trust. . . .  The only disbursement

from this account was a check in the sum of $3,900.00 payable to me as Trustee, which I

deposited into a newly-established Trust account at Rockland Trust Company. . . . None

of the net proceeds from the real estate transaction have been spent or otherwise

dissipated, and remain deposited in the two accounts referenced above."

On July 14, 2016, the Court entered a separate Preliminary Injunction Order

submitted by the Trustee (the "Injunction"), which specifically prohibited Josephson,

individually and as the trustee and beneficiary of the Winding Way Realty Trust, from

"transferring, encumbering, mortgaging, pledging, secreting, alienating, assigning, or

otherwise disposing of the proceeds of Josephson's sale of the property at 84 Winding

Way, Plymouth, MA, in [an] amount not less than $375,119.64 ("Proceeds"), or from

taking or permitting the taking of any action which would result in a dissipation or

dilution of the value of the Proceeds[,]" pending further order of the Court.  The Trustee

did not seek to obtain possession or control of the sale proceeds or segregate them in an

escrow account.  Rather, she relied on the provisions of the Injunction.

Nearly two years later, on June 20, 2018, the Trustee filed the Contempt Motion in

Adv. Pro. No. 16-1064, in which she asserted that records she obtained from Fidelity on

June 19, 2018 indicated that Josephson "has been spending the Proceeds in violation of

the Injunction" and that "[t]he Injunction prohibits all of this spending."  She further

asserted that Josephson began dissipating funds in the Fidelity Investments account in

May of 2017 when investment gains put the value of the account over $375,119 for the

first time.  She sought, *inter alia*, an order requiring Josephson to restore amounts he had

withdrawn from the account in the amount of $63,764.11 and the transfer of the Fidelity Investments account to a third party escrow agent. The Court held a preliminary hearing on the Contempt Motion in Adv. Pro. No. 16-1064 on June 25, 2018 and ordered "the immediate transfer of the funds currently in the Fidelity account established by [Josephson] to the Chapter 7 Trustee to hold in an escrow account . . . " and scheduled an evidentiary hearing on the Motion for July 10, 2018.

At the July 10, 2018 evidentiary hearing, the Trustee introduced monthly statements for the Fidelity Investments account, for the period of May 16, 2016 through May 31, 2018 (the "Fidelity Statements"). The amount of money in the Fidelity Investments account established by Josephson fluctuated owing to investment gains/losses and withdrawals by Josephson. In fact, the value of the account was as high as $407,827.67 as of January 31, 2018 and as low as $364,967.78 as of April 30, 2018. The value of the account dropped below $375,119.64 several times in 2016, 2017 and 2018 while Josephson was bound by the Injunction, a fact not rebutted by Josephson.

With respect to the proceeds of the sale of the Winding Way property, Josephson testified that he wrote checks on the Fidelity Investments account payable to the Winding Way Realty Trust and deposited them in an account at Rockland Trust Company in the name of the Winding Way Realty Trust, an account to which the Debtor had access. In addition, he testified that he used an ATM card to make withdrawals from the Fidelity Investments account. The Fidelity Statements reflected numerous debit card withdrawals for the account in 2017 and 2018, which Josephson testified he used to pay personal expenses. According to the Fidelity Statements, as of April 30, 2018 and May

31, 2018, the account had a value of $364,967.78 and $367,453.61, respectively.  Such sums

were less than the $375,119.64 in proceeds from the sale of the Winding Way property

that were the subject the Injunction.

Josephson explained his position with respect to the proceeds of the sale of the

Winding Way property deposited into Fidelity Investments account as follows:

> My attorney, Seth Roman, I became aware of the $3275,000 [sic] threshold
> only recently in this last appearance in the court. Nobody ever explained to
> me that I had to -- I couldn't go below that. And also I have no way to
> control the market fluctuations, so I mean, there's going to be a time when
> it's below that threshold and it's beyond my  control. I did have control of
> my spending. However, if you do look at the majority of these
> expenditures, it's clearly having to do with the long-term move, Your
> Honor. It's gas and food all the way down the line. . . .

Moreover, after the June 25, 2018 hearing, Josephson testified that he contacted the

account manager at Fidelity.  He stated:  "I immediately called David Lesser who's in

control of that account. I left him a message and -- an urgent message and he called me

first thing the next morning and I gave him permission to liquidate those funds, those

funds that represent a lifetime of hard work, by the way."

B. The Motion for Contempt Order and Related Sanctions against the
Debtor, Josephson and Jackson Hole Classic Cars, LLC for Defying Court
Order in the Main Case

The Trustee filed the Contempt Motion in the main case on June 5, 2018, in which

she asserted that the Debtor, Josephson and JHCC had failed to comply with prior orders

of the Court requiring, *inter alia*, the turnover of non-exempt vehicles to the Trustee. The

Court conducted a preliminary hearing on the Contempt Motion in the main case on June

25, 2018 at which it entered the order requiring the Debtor, Jackson Hole and Josephson

to deliver to the Trustee by June 27, 2018 "all keys, registrations, titles, and other documents relating to ownership of all of the Vehicles" and setting an evidentiary hearing for July 10, 2018 to determine whether the Debtor, Jackson Hole and/or Josephson should be held in contempt.

At the July 10, 2018 evidentiary hearing, Josephson testified that he moved most of the vehicles to Parsonsfield Maine, that the last time he moved a vehicle to Maine was in December of 2017 and that no vehicles were moved by him after January 24, 2018.[8]  The testimony unequivocally established that neither the Debtor nor Josephson delivered the keys to the Vehicles to the Trustee by 5:00 PM on June 27, 2018 or the titles and registrations to certain vehicles as required by the Court's order dated June 25, 2018. Josephson testified as follows: "It's tough to find all the titles to these cars. I mean, given the chaos that we've gone through in the past five years they're in the barn [in Parsonsfield, Maine] somewhere."  He gave the same response when questioned about registrations, adding "It's hard to keep track of everything.  Our life has been flipped upside down.  You -- do you know what's happened in your life the past two weeks, every little detail? For five years we've been going back and forth to Maine, sir." Josephson also admitted that he had not turned over the keys.  He testified as follows:

> I think it's a danger to turn over the keys. What if there was a fire? How would I move the cars? There's one set of keys per car. If we turn those keys over, what am I going to do if the barn catches on fire as you guys seem to

---

[8] As noted above, at the hearing on January 24, 2018, there was no representation by either counsel to the Debtor or counsel to Josephson that most of the vehicles had already been moved to Parsonsfield, Maine.

want to insinuate that it's so dangerous for these cars to be there and
unsafe?

In addition, he admitted that he had made no attempts to deliver the vehicles themselves

to the Trustee or her agent, stating:

> I'm awaiting the outcome of today so then we'll know at the end of the day
> what's going to happen. I feel they're safe. They're in a modern structure.
> The guy who built it told me it was a 100-year barn. They're not going
> anywhere until the Judge decides what she wants to do with them. But for
> now it would be ridiculous for me to think that I'm going to move them all
> the way back here after I spent a good portion of the past few years moving
> them there.

Josephson admitted that he did not deliver all the vehicles to Parsonsfield, Maine

in 2017.  He indicated that several vehicles had been there for years, including two MGs.

Four other vehicles, namely a 1987 Volkswagen Vanagon, a 1999 Bentley Arnage, a 1948

Ford pickup, and an old 2004 plow truck, are located in Massachusetts.  Josephson further

testified that he always "acted in the best interests of the vehicles themselves," adding:

> As a trustee I feel that I'm responsible for the care of those vehicles, safety
> and safe transportation to a safe, secure facility which is -- happens to be a
> property that we own, my brother and I, in Maine. It's a very, very secure
> place, Your Honor, and safe. But given the fact that there could be an
> emergency -- you never know -- those cars can't be moved without the keys.

Josephson testified that he made no attempt to deliver the keys to the Trustee because he

"really believe[s] it's a danger to the entire fleet of cars if we don't have a way to move

them. Safety issues only, not -- I mean, nothing clandestine."

The Debtor also admitted that he had not turned over any keys or registrations to

the Chapter 7 Trustee by the June 27, 2018 deadline imposed by the Court's order dated

June 25, 2018.  When asked about the status of several titles he had not delivered to the

Trustee, the Debtor stated his belief that the Trustee had "all the titles that I have." When asked about nine missing titles, he testified: "That's totally impossible. Totally impossible." Nevertheless, the Debtor indicated that he had a title to a Corvette.

When the Debtor was asked whether cars were moved to Parsonsfield, Maine after the Court's January 24, 2018 order, he testified as follows:

> These cars were protected at all times. Whether or not some were moved after, I can't tell you that. I am not Houdini. I do know that we did everything in our power to protect the cars that I'm responsible for. If debtor – and Eric did the same or any Jackson Hole cars. If we're talking about which ones went or which ones didn't go, I think we've said primarily most of them were in Parsonsfield that were valuable and that were important to us to protect. Other ones that are less important are still hanging around in Osterville or in Centerville in someone's house. They're not that valuable and they're not a concern. The ones that are of concern to you and to us and to this court are the valuable cars. They're all in Parsonsfield and they have been protected beyond belief. Beyond belief. So my answer is, there was no attempt to violate anything. We're just trying to do what is best for this estate which is now in the fourth and a half year. Landmark, four and a half years, trying to protect cars at my expense insurance-wise, registration-wise, all of the things you've cited today, all my responsibility. And if I miss a beat, guess what? I would have been in a Chapter 7 a whole lot sooner.

The Trustee inquired of the Debtor about a "Report Relative to Safekeeping of Vehicles" filed by him on January 23, 2018, one day before the January 24, 2018 hearing. In that Report, the Debtor stated the following:

> Robert J. Spenlinhauer reports to the Court that several of his personal vehicles have been transported via trailer from 828 Sea View Avenue in Osterville, Massachusetts to Parsonsfield [sic], Maine, where they are stored indoors and the balance of the vehicles will be transported to Parsonfield [sic], Maine or possibly elsewhere prior to March 11, 2018.

In response to that Report, the Debtor stated he did not know whether any vehicles were transported to Parsonsfield, Maine after January 25, 2018. Later in his testimony, he

admitted that he moved the Holiday Rambler, one of two RVs that he owned, to Parsonsfield, Maine in late March of 2018 and that he drives a 2015 Chevrolet.

In their testimony, both the Debtor and Josephson, who, though not a blood relative of the Debtor, described their relationship as "father and son" and familial, lamented their lack of financial resources, and complained of the burdens placed on them by this bankruptcy case. The Debtor also testified that he did not "have enough money to hardly live."

## III. APPLICABLE LAW

The bankruptcy court has "broad authority to exercise its equitable powers to ensure compliance with its own orders." Fatsis v. Braunstein (In re Fatsis), 405 B.R. 1, 7 (B.A.P. 1st Cir. 2009) (citing Ameriquest Mortg. Co. v. Nosek (In re Nosek), 544 F.3d 34, 43 (1st Cir. 2008)). "Section 105(a) confers '[on the bankruptcy court] statutory contempt powers' which 'inherently include the ability to sanction a party.'" 405 B.R. at 7 (citing Nosek, 544 F.3d at 43–44).

> The traditional justification for the relative breadth of the contempt power has been necessity: Courts independently must be vested with "power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates, and ... to preserve themselves and their officers from the approach and insults of pollution." Courts thus have embraced an inherent contempt authority, as a power "necessary to the exercise of all others[.]"

Int'l Union, United Mine Workers of Am. v. Bagwell, 512 U.S. 821, 831 (1994). In addition, "it is firmly established that '[t]he power to punish for contempts is inherent in all courts.'" Chambers v. NASCO, Inc., 501 U.S. 32, 44, 111 S. Ct. 2123 (1991) (quoting Ex parte Robinson, 19 Wall. 505, 510, 22 L. Ed. 205 (1874)).

In <u>Heaney v. Lamento (In re Whiz Kids Dev., LLC)</u>, 576 B.R. 731 (Bankr. D. Mass.

2017), this Court observed:

> A party alleging civil contempt must establish by clear and convincing
> evidence that a contemnor violated a court order, <u>AccuSoft Corp. v. Palo</u>,
> 237 F.3d 31, 47 (1st Cir. 2001) (citation omitted), and substantial compliance
> can avert a finding of contempt. <u>Langton v. Johnston</u>, 928 F.2d 1206, 1220
> (1st Cir. 1991). "[C]ivil contempt will lie only if the putative contemnor has
> violated an order that is clear and unambiguous [,]" <u>Project B.A.S.I.C. v.
> Kemp</u>, 947 F.2d 11, 16 (1st Cir. 1991), and it is sufficient that the court order
> violated be "specific and definite" and that the offending party had
> knowledge of the court's order. <u>Slaiby v. Rassman (In re Slaiby)</u>, 73 B.R. 442,
> 444 (Bankr. D. N.H. 1987) (quoting <u>Fidelity Mortg. Investors v. Camelia
> Builders, Inc.</u>, 550 F.2d 47, 51 (2d Cir. 1976) (citations omitted), *cert. denied*,
> 429 U.S. 1093, 97 S.Ct. 1107, 51 L.Ed.2d 540 (1977)).

<u>In re Whiz Kids Dev., LLC</u>, 576 B.R. at 757.  The court in <u>Fatsis</u> similarly stated that "The

test is whether the contemnor is 'able to ascertain from the four corners of the order

precisely what acts are forbidden.'" 405 B.R. at 7 (citing <u>Goya Foods, Inc. v. Wallack

Mgmt. Co.</u>, 290 F.3d 63, 76 (1st Cir. 2002)).  It added:  "The 'clear and unambiguous'

standard is limited to an examination of the language of the order and does not include

an inquiry into the legal efficacy of the order itself."  <u>Id.</u>

Civil contempt sanctions may be coercive or compensatory.  If a sanction is

compensatory, it may not exceed the actual damages caused.  <u>Int'l Union, United Mine

Workers of Am. v. Bagwell</u>, 512 U.S. 821, 829 (1994); <u>Gregor v. Depte</u>, 896 F.2d 31, 34 (3d

Cir. 1990).  The differences between criminal and civil contempt sanctions, however, can

be difficult to discern.  <u>Bagwell</u>, 512 U.S. at 827. "Generally, civil contempt 'is remedial,

and for the benefit of the complainant,' while criminal contempt 'is punitive, to vindicate

the authority of the court.'" <u>F.T.C. v. Trudeau</u>, 579 F.3d 754, 769 (7th Cir. 2009) (citing

15

Bagwell, 512 U.S. at 827-28). A monetary sanction can compensate the plaintiff while a coercive one should induce compliance with a court order. "A coercive sanction must afford the contemnor the opportunity to 'purge.'" Trudeau, 579 F.3d at 769 (citing Bagwell, 512 U.S. at 829).

In contrast to civil contempt sanctions, a criminal contempt sanction is in the nature of an unconditional fine without an opportunity to reduce the fine through compliance. Bagwell, 512 U.S. at 829. As discussed in Whiz Kids Dev., LLC, the authority of a bankruptcy court to impose punitive damages under its contempt authority as opposed to sanctions under a specific Bankruptcy Code provision expressly empowering a court to impose fines and punitive damages, such as § 362(k), has been the subject of much debate and is unsettled. In re Whiz Kids Dev., LLC 576 B.R. at 756 (concluding that the issue appears to be unresolved in the First Circuit and limiting its consideration to sanctions which are employed in civil contempt proceedings). Indeed, there is widespread disagreement as to whether a bankruptcy judge has criminal contempt powers. See John A.E. Pottow & Jason S. Levin, *Rethinking Criminal Contempt in the Bankruptcy Courts*, 91 Am. Bankr. L.J. 311, 313 (2017) (noting firmly established circuit precedents prohibiting bankruptcy courts from imposing criminal contempt sanctions but concluding "there is nothing intrinsically problematic . . . with bankruptcy courts issuing criminal contempt orders."). Because of the uncertainty surrounding bankruptcy court authority to issue orders of criminal contempt and the Trustee's failure to specifically request a criminal contempt sanction, the Court denies criminal contempt sanctions.

16

## IV. DISCUSSION

A. <u>The Motion for Contempt and Sanctions against Josephson, Individually and as Trustee and Beneficiary of Winding Way Realty Trust- Adv. P. No. 16-1064</u>

The Trustee's position in her Contempt Motion filed in Adv. Pro. No. 16-1064 that the Injunction prohibits all spending from the Fidelity Investments account is an expansion of the scope of the Injunction which enjoined Josephson and his agents from transferring or otherwise disposing of the sale proceeds "in [an] amount not less than $375,119.64 ("Proceeds"), or from . . . dissipation or dilution of the value of the Proceeds." The Injunction does not expressly prohibit spending from any account into which the net sales proceeds were deposited, and the Trustee apparently did not contemplate the effect of market fluctuations on the value of Fidelity Investments account when she proposed the form of Injunction. The Court finds that Josephson's duty under the Injunction was limited to maintaining at least $375,119.64 in the account at all times, pending further order of the Court. That obligation was clear and unambiguous from the provisions of the Injunction.     Josephson's testimony that he did not comply with the Injunction because "Nobody ever explained to me that I had to -- I couldn't go below that [the amount of the Proceeds']" was implausible and immaterial.

> Where an injunction is in effect, the party bound by the order is responsible for ascertaining whether any proposed actions are among the proscribed activities. "[I]t is not the plaintiff's obligation to police the decree but the defendant's obligation to make certain he does not violate it. Thus if the defendant saw the decree as ambiguous on the point in question, he could have sought clarification from the court before he engaged in the questionable conduct."

<u>Demoulas v. Demoulas Super Markets, Inc.</u>, 424 Mass. 501, 569, 677 N.E.2d 159, 203 (1997) (citation omitted).

As noted above, at the time the Injunction was entered, Josephson was represented by counsel who was present at the hearing when the Court considered the Trustee's preliminary injunction motion. Josephson cannot escape the consequence of contempt by claiming ignorance, particularly where his attorney was fully apprised of all the orders entered by the Court and could have, but did not seek clarification of them if he thought they were in any way ambiguous. Josephson may not excuse his conduct in withdrawing funds from the Fidelity Investments account and permitting the balance to drop below $375,119.64, by blaming his former attorney. "[P]arties are bound by the actions of their attorneys, and '[a]ny other notion would be wholly inconsistent with our system of representative litigation.'" <u>Schofield v. French</u>, 215 F.3d 1312 (1st Cir. 2000); <u>Scola v. Beaulieu Wielsbeke</u>, 131 F.3d 1073, 1075 (1st Cir. 1997). "The relationship of the Debtor to her counsel is that of principal to agent, and '[a]ttorneys are . . . presumed to act with authority from—and as agents of—their clients.'" <u>Taub v. Hershkowitz (In re Taub)</u>, 421 B.R. 93, 105 (Bankr. E.D.N.Y. 2009) (citations omitted).

Josephson willfully violated this Court's orders dated June 28, 2016 and July 14, 2016 enjoining the dissipation or dilution of the Proceeds from the sale of the Winding Way Property below $375,119.64 and is in contempt of those orders. As Josephson testified that he is without a significant source of income, his ability to pay compensatory sanctions is presently unclear. <i>See</i> <u>United States v. Bryan</u>, 339 U.S. 323, 330–334, 70 S. Ct. 724, 730–732 (1950) (ordinarily, one charged with contempt of court for failure to comply

18

with a court order makes complete defense by proving that he is unable to comply). Accordingly, the Court will conduct a further evidentiary hearing on the appropriate compensatory remedies for Josephson's contempt to be held on August 20, 2018 at 1:00 PM.   In order for the Court to establish Josephson's ability or inability to pay a compensatory sanction, he is ordered to file, on or before August 16, 2018, an affidavit setting forth the monthly income and expense information required by Bankruptcy Schedules I and J. At the evidentiary hearing, the Trustee and all parties in interest will have an opportunity to inquire about Josephson's ability to pay any compensatory damages.

With respect to the Trustee's specific requests for relief in her "Motion for Contempt Order and Related Sanctions against Josephson Individually and as Trustee and Beneficiary of Winding Way Realty Trust For Violating Preliminary Injunction Order," listed above in footnote 3, the Court rules as follows.  The first request for relief (i) is moot based upon the Status Report submitted by the Trustee on July 12, 2018 in which she confirmed her receipt of a check from Fidelity in the amount of $365,315.64 on that date. The Trustee's requests for compensatory sanctions (ii and iii) shall be considered at the August 20th hearing.  The Trustee's request for monetary sanctions as a penalty (iv) is denied as the request is in the nature of criminal contempt sanctions which the Trustee failed to establish is within this Court's authority to impose.  The Trustee's request for a default judgment (v) is not supported by any citation to authority. The Court defers consideration of that request at this time, subject to the Trustee's submission of legal authority on the issue.

B. <u>The Motion for Contempt Order and Related Sanctions against the Debtor,
Josephson and Jackson Hole Classic Cars, LLC for Defying Court Order in the
Main Case</u>

The order entered by this Court on June 25, 2018 in the main case was clear and
unambiguous, particularly when viewed in the context of the Court's prior orders,
including the order dated January 24, 2018 granting the Trustee's Expedited Motion to
Secure and Store Vehicles to Preserve Estate Property in the Face of Eviction, and the
Court's order dated February 27, 2018 denying the Debtor's Expedited Motion to Vacate,
together with the absence of any stay of those orders pending appeal and the denial of a
stay by the United States District Court for the District of Massachusetts.  Josephson and
the Debtor were required pursuant to the clear and unambiguous order dated June 25,
2018 to deliver the keys and other documents to the Trustee by June 27, 2018, and they
failed to do so.  In addition, the Debtor admitted that he delivered an RV to Parsonsfield,
Maine after the entry of this Court's order of January 24, 2018 in which this Court
determined that Parsonsfield, Maine was not an appropriate place to secure and store the
vehicles which are now property of the Chapter 7 bankruptcy estate.  Both the Debtor
and Josephson expressed the view that they were acting as "trustees" for the safety and
security of the vehicles, a role that ignored the paramount fiduciary obligation of the
Debtor to the estate, the effect of orders of this Court, and the requirement of compliance.

With respect to the prayers for relief in the Trustee's Motion for Contempt Order
and Related Sanctions against the Debtor, Josephson and JHCC for Defying Court Order,
listed above in footnote 2, the Court rules as follows.  The first request (i) is moot as the
Court has previously converted this case to one under Chapter 7.  The Court defers the

20

Trustee's request to obtain the assistance of a professional to recover the Vehicles (ii) until the Trustee seeks to employ a repossession professional in the bankruptcy case. The Court denies the request for monetary sanctions as a penalty (iv) as the request is in the nature of criminal contempt sanctions which the Trustee failed to establish is within this Court's authority to impose. The request for an order authorizing the Trustee to liquidate one or more of the Estate Vehicles to pay a monetary sanction award (v) is obsolete now that the Debtor's case has been converted to one under Chapter 7 as the Trustee has a preexisting duty to liquidate property of the estate under 11 U.S.C. § 704. The Trustee's request for compensatory sanctions and the amount of any such sanctions (iii) shall be considered at the August 20th evidentiary hearing in light of the assertions of the Debtor and Josephson that they have no significant source of income. The Debtor shall file on or before August 16, 2018 an affidavit setting forth the monthly income and expense information required by Bankruptcy Schedules I and J. At the August 20th hearing, the Trustee and all parties in interest will have an opportunity to inquire about the Debtor's ability to pay any compensatory damages.

Additionally, the Debtor, Josephson, and/or JHCC shall deliver to the Trustee at or before the August 20, 2018 hearing all keys, and all titles and registrations to the vehicles not previously delivered to the Trustee, whether located in Parsonsfield, Maine or elsewhere. The Court will consider all coercive sanctions available at the August 20, 2018 hearing in the event they fail to comply with the foregoing order. The Court shall, upon appropriate application, authorize the Trustee to employ an agent to retrieve the

vehicles from Parsonsfield, Maine and other locations and to secure and store them in an insured location.

## IV. CONCLUSION

For the foregoing reasons, the Court grants the Contempt Motions in both the main case and Adversary Proceeding No. 16-1064.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated:  August 10, 2018